Okay, Ms. Reynolds, let's let everyone get a chance to get completely settled, but you can come on up to the podium. Just wait a second. Plenty of time. Okay, Ms. Reynolds. Good morning. My name is Leanna Reynolds, and I'm the attorney for Mr. James Hollinger, and may it please the court. The overarching issue today has to do with the administrative law judge's consideration and treatment of the plaintiff's mental health limitations in his decision, and in our brief, we have broken it into three arguments, with the first issue having four sub-arguments. And before I get into the specifics, I would just like to note that our position and our argument that this case fails to comport with proper legal standards and is not supported by substantial evidence has to do with three medical opinions in this case, from Dr. Buck, a consultative examiner, Dr. Whalen, who was also a consultative examiner, and nurse practitioner Turnage, who had treated the plaintiff, I think, around 11 times throughout the course of her treatment history. This case initially went before an administrative law judge, and he rendered an unfavorable decision in July of 2017. Subsequent thereto, it was remanded, and then because the ALJ did not consider the opinions of nurse practitioner Turnage, and then there was a subsequent unfavorable decision on January the 23rd of 2019. With respect to the first argument, and the reasons that we have enumerated in our brief as to why the ALJ's decision does not comport with proper legal standards, is looking comparatively at the first unfavorable decision to the second. In this second unfavorable decision, the ALJ explicitly stated, when referencing the non-examining state agency's opinion, that additional mental limitations based upon subsequently obtained objective medical evidence showing additional exertional and mental limitations were factored into the decision, and it's our position and our argument that this did not occur specifically due to the fact that they are virtually indistinguishable. Second, in this decision, the ALJ gave the consultative examiner's opinion Dr. Buck's significant weight. He relied heavily on this opinion, and in his decision, he stated, this is based upon objective observation and findings, so when you look at this opinion, you would think that these findings from Dr. Buck would be incorporated into the residual functional capacity of the ALJ. Well, in this specific case, they weren't, and whenever prejudice is established to our client, because when the limitations by Dr. Buck were proposed to the vocational expert, there were no jobs found, and also, at the administrative hearing, the administrative law judge himself said, if I go with Dr. Buck's opinion, that would support a finding of a listing, so by the ALJ's definition, Dr. Buck's definition, and the ALJ giving this opinion significant weight, there should have been a favorable determination on behalf of this plaintiff, and there wasn't. With respect to the opinion of Dr. Whalen, the ALJ talks about discounting it because he says that the claimant's ability to deal with work stresses was inconsistent with Dr. Buck's opinion, but that's not particularly the case, specifically due to the fact that Dr. Buck really never had a separate finding for the ability to deal with work stresses, but everything else within that opinion corroborates the findings that were made by Dr. Buck, and again, going back to Dr. Buck's opinion, at the administrative hearing, the administrative law judge said, based on this opinion of Dr. Buck, he makes a listing. If I can get another evaluating opinion that comports with Dr. Buck, I'm likely to go all the way back to the alleged onset date and essentially award this claim, and then Dr. Whalen's opinions further reinforce the findings by Dr. Buck when finding that the plaintiff would have a poor ability to interact with supervisors and a poor ability to interact with coworkers. When you look at Dr. Whalen's interpretation key, he identifies that as a marked limitation in both of those domains, which would be enough to meet the listed requirements of these impairments. What should we make of the fact that, as I understand this record, you can correct me if I'm wrong, your client worked full-time from 1997 to 2009. That's a 12-year period, I believe. Well, the work record, anyone can have a work history and then have a disabling event that happens, and after the fact, or after that disabling event occurs, and this generated medical evidence supports the finding of disability, I think that refutes his ability to work. Primarily, circling back to Dr. Buck, that wasn't the nexus of why the ALJ rendered an unfavorable decision in this case. He gave Dr. Buck's opinion significant weight, which is supportive of a finding of disability. I think the work history, if anything, further adds to the credibility to a claimant's case, because it demonstrates the fact that if they were capable of engaging in gainful employment, they would be, up until the fact that this claimant started experiencing these debilitating mental health symptoms. And then, lastly, with the ALJ statement that Ms. Turnage's, the nurse practitioner's, treatment is inconsistent with treatment notes, that's not accurate in our briefly enumerated treatment visits that would well support her findings and her opinions. And then, with respect to the second argument, there was a non-examining physician, Linda Baker, who completed her review of the file on April 7th of 2015, which is nearly four years prior to the time that the ALJ rendered his decision, which was without four years of material medical evidence, such as Ms. Turnage's opinion and Dr. Whalen's opinion. And that, I think, relying on an opinion like that without the benefit of material evidence further supports our findings. And then, lastly, the single-tier case that has since been distinguished by the Dunbar-Frank and Perez cases that were cited in the Commissioner's reply brief and our reply brief discusses not only is it an individual's ability to be able to work within the RFC, but also you have to look at the ability to maintain employment when it's necessary. And in this specific case, whenever someone has intermittently recurring symptoms that exist at a disabling level, it's not just whether someone can work on a day-to-day basis, it's whether or not someone can sustain employment. And it's our position and our argument, given all of the medical opinions in this case, that support a finding of disability from every examining physician that this analysis should have been performed. And that's all I have, unless there are any questions specific to this. If you can take time for rebuttal, Ms. Reynolds. Yes, Your Honor. All right. Mr. Goh. Thank you, Your Honor. May it please the Court. I'm Johnny Goff. I'm an assistant United States attorney in the Northern District of Mississippi. I brought along with me one of my colleagues, Stuart Davis, a fellow AUSA in my district. Just to start off, I want to give the Court a little bit of background. This is unusual in the sense that Social Security cases in our district, every single one of them are argued to a master judge orally, which I'm not aware of that being the case in any other district in the country, the world. But we all, Ms. Reynolds, Mr. Davis, and I have been arguing these a very long time, and I really appreciate the opportunity to argue before Your Honors today. This is something we don't get to do very often. You have a generous bench in Mississippi, huh? Yes. I think they're extremely generous, Your Honor. Some lawyers have a hard time, and even young lawyers, getting to argue motions and so on and so forth. So that's illuminating. And as I argued in the district court below before Judge Varden, look, this case, this opinion has lots of problems. But that doesn't mean that the decision is not supported by As Ms. Reynolds pointed out, there's this exchange during the hearing between the ALJ and Claimant's Counsel, where the ALJ is discussing, do I need to send Mr. Hollinger out for another consultative exam? I've already got Dr. Buck's consultative exam. Quote, essentially I have Dr. Buck on this side saying that the gentleman is likely to meet a listing, a mental listing that's supported by Nurse Turner, but she's got not an acceptable medical source. On the other side, I've got the state evaluation, that's DDS, that says no. I've got the records from, it says Communicator, but it's Communicare that seem to indicate his biggest problem is alcohol abuse and malingering to try to get disability benefits. I've got to have something to tilt the scale. Okay. So he sends Mr. Hollinger out for a consultative examination that's performed by Dr. Whalen. And Dr. Whalen makes findings and says that with regard to Mr. Hollinger's ability to do work, that he has fair to good ability to follow work rules, relate to co-workers, deal with the public, use judgment, function independently and maintain attention and concentration, which on that last point, that is different than what Dr. Buck found, by the way. She found that he could not maintain a proper attention and concentration. Dr. Whalen finds checks poor under interaction with supervisors and deal with work stresses. Now, it was characterized previously that that is a market limitation with regard to this scale that's contained within this medical assessment prepared by Dr. Whalen. What it says is poor is the ability to function in this area is seriously limited, but not precluded. And we would argue that the RFC reflects not only what Dr. Whalen found, but also there's other evidence in the record, namely from DDS and Communicare, as the ALJ previously mentioned, that supports this RFC. Specifically, finds that the claimant can perform light work with simple instructions and simple routine repetitive tasks. Well, I think both Drs. Buck and Whalen found that. Occasional non-confrontational interaction with supervisors, rare incidental contact with co-workers, no work involving close cooperation and never with the general public. Poor does not mean he can't do it. It means That's pretty limited though, isn't it? That is an extremely limited RFC, number one. And what did the record show, if anything, about available jobs? I can't remember exactly what the VE found at step five with regard to jobs that were available, but he found that there were jobs available in the national economy with regard to this particular RFC. But, again, interaction with supervisors and dealing with work stresses is marked as poor. Well, that's accounted for here in the RFC, because there's occasional non-confrontational interaction with supervisors, rare incidental contact with co-workers, no work involving close cooperation, never with the general public. Now, I understand where the problem is in this case, as Ms. Reynolds pointed out, and she's correct. The ALJ in this case says, well, I'm given, this is, so, even after he initially says, I can't go with Buck because he'd made a listing, I'm going to send him out for another CE, he goes with Buck, which is nonsensical when it comes to this particular decision. He says, I'm giving Dr. Buck significant weight. Then he discusses Dr. Whalen, says Dr. Whalen is some weight because he discounted the two poor areas. What I submit to the court is this. It doesn't matter that he screwed this up in this way, because there's evidence in the record to support the RFC. That is the ultimate question. Procedural perfection in these cases is not required. These ALJs handle hundreds of these cases per year. They make mistakes, as I believe this is a mistake here, because it's nonsensical. When you judge it against, or when you take a look at it versus his statements on the record to counsel opposite, and then he goes with the doctor and gives them significant weight, that just doesn't make sense. But is there evidence in the record to support this finding? And the answer is yes. Not only Dr. Whalen, as I pointed to earlier, but there's a treatment record where the claimant was seen by Communicare, which the ALJ referenced. That record says, 41-year-old male seeking his third readmission and trying to obtain disability benefits. They noted that his attention and concentration were within normal limits. He had a normal memory. He had a normal fund of knowledge. His abstract ability was intact. He was noted to, under comments, noted to be malingering, and then discharged on the same day as he went to try to be admitted. No need for services here is the note written by Dr. Karen Mitchell, a psychologist at Communicare. That is from an examining physician, or doctor, that found him not believable, and also that his attention and concentration, memory, orientation, and sense and cognition were within normal limits. The only thing that she noted that was, with regard to the mental examination, that was not within normal limits was his judgment was partial. But again, found that he should be discharged with no need for services. Now, DDS had that record, and they also had Dr. Whalen. They made a finding that's supportive of the RFC as well. Council opposite argued that because DDS did not have later records, that of Nurse Turnage, a nurse practitioner, and of Dr. Whalen, that it's unreliable. Well, it is reliable. If that was the case, you could never rely on DDS opinions, because there's always going to be medical evidence that comes into record after they review the case. They're at an early stage of the case. But no courts have said that you can't rely on a DDS doctor's opinion for substantial evidence. Now, when it's relied upon on its own in the pre-rules cases, and it's a trading doctor, you get into a Newton situation, we don't have that here. This is a case where there is no treating doctor, there is no Newton case. But the DDS finding comports with what Dr. Whalen said later. It's not anything that dovetails away from the later evidence that's in the case. The current finding was that he's capable of understanding and carrying out instructions, and can maintain attention and concentration adequately for two hours and an eight-hour day. That's normal. Claimant can complete a normal work week without excessive interruptions from psychological symptoms. He can relate appropriately to coworkers and supervisors on a limited basis. Again, the RFC is limited in that regard. And he can adapt to a job setting, and that's signed by Dr. Linda Baker in April of 2015. That record, the CommuniCare record, and I would submit Dr. Whalen's opinion, are supportive of the RFC. And as such, there's substantial evidence in the record to support the ALJ's RFC. And if there's not any questions, I don't have anything further. Thank you, Mr. Goff. Thank you. Mr. Reynolds, you've saved some time for a bow. It's okay, take your time. In these cases, the ALJs typically stand and fall with what they put in their decisions. And in this specific case, he gave Dr. Buck's opinion significant weight. And it's a rare situation. There are a bunch of district court cases when an ALJ gives someone significant weight and does not incorporate those restrictive functionings into their RFC that the decision is not supported by substantial evidence. With respect to Dr. Whalen's residual functional capacity, he found that the claimant would have poor abilities in two different areas. And when you look at the key, that translates into a marked limitation. And in our brief, in our argument, we talked about that if the plaintiff has two marked limitations, it really doesn't matter even what happens within the RFC, then that further supports the listing argument and that he should be found disabled before even going to those other steps of the sequential process. And that does corroborate Dr. Buck's findings because on its face, even the ALJ at the administrative hearing says Dr. Buck supports finding a listing. And all of those things working together, specifically the fact that every examining physician that rendered an opinion, Dr. Buck and Dr. Whalen, both support a finding of disability on behalf of this claimant, in addition to the nurse practitioner who treated this plaintiff had a long treatment history. So all of those things working together support the contention that this case is not supported by substantial evidence. And with respect to those DDS non-examining physicians, usually that is the case when they're not so stale, but when you look at the procedural history of this case with it being remanded and going on for, now it's on I think seven years, they were, when they're made without the benefit of material evidence, that weakens the credibility of those opinions because they don't have material medical evidence. So for those reasons, we're requesting a reversal or a rendering or an alternative or remand. Thank you Ms. Reynolds. Your case and all of today's cases are under submission.